**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

ENTERED
03/09/2018

| | | |
|---|---|---|
| IN RE: | § | |
| CAPROCK OIL TOOLS, INC. | § | CASE NO: 17-80109 |
| Debtor(s) | § | |
| | § | CHAPTER 11 |

## MEMORANDUM OPINION

Caprock Oil Tools, Inc. filed a voluntary chapter 11 bankruptcy petition on April 10, 2017. (ECF No. 88 at 7). Wayne Hall asserted a $1,479,870.94 unsecured proof of claim in Caprock's bankruptcy case, owed after Caprock exercised its right of repurchase of Hall's Common Stock on February 13, 2015. (ECF No. 88 at 7). Caprock filed an objection to the proof of claim alleging that it is subject to mandatory subordination under 11 U.S.C. § 510(b). The parties filed cross motions for summary judgment.

Caprock's motion for summary judgment is granted. Hall's motion for summary judgment is denied.

### Background

Caprock supplies oil and gas businesses with customized rock drill bits for use in oil and gas drilling and exploration. (ECF No. 2 at 2). Hall served as Caprock's vice president and owned 177 shares of Common Stock in Caprock. (ECF No. 88 at 8). On January 1, 2010, Caprock and Hall entered into a Shareholder Agreement that restricted Hall's right to transfer his Common Stock but also dictated how his stock would be paid in case he separated from Caprock. (ECF No. 88 at 9). Whether Hall was terminated for cause or departed voluntarily, the Shareholder Agreement stated that Caprock had the right to "repurchase the shares of Common Stock owned by [Hall] at the time of termination." (ECF No. 88 at 9). The Agreement dictated

the amount paid for Common Stock as the Attribution Amount, and separated the payment into "five equal annual installments."  (ECF N. 88 at 9).

These provisions of the Shareholder Agreement were triggered in January 2015, at which time, Caprock valued Hall's Common Stock at $1,783,228.00.  (ECF No. 87 at 6).  Caprock informed Hall of this valuation via e-mail.  (ECF No. 87 at 6).  At this time, Caprock proposed to Hall a Stock Purchase Agreement whereby Caprock would pay Hall the value of his Common Stock through an initial payment of $356,645.60 followed by four other annual payments of the same amount.  (ECF No. 87 at 7).  Hall failed to take action on Caprock's proposed Stock Purchase Agreement.  (ECF No. 87 at 8).  Caprock sent Hall another e-mail on February 13, 2015, advising him that it had elected to pursue its repurchase in accordance with the terms of the Shareholder Agreement and would send him an initial payment to be followed by four annual installments.  (ECF No. 87 at 8).  Caprock's e-mail stated that Hall's shares were "redeemed and are no longer outstanding."  (ECF No. 87 at 8).

Caprock sent Hall an initial check for $356,645.60 but failed to make any of its subsequent annual payments.  On April 7, 2017, Caprock filed for chapter 11 bankruptcy.  (ECF No. 1).  Hall filed a proof of claim in the bankruptcy case, alleging a right to payment of $1,479,870.94 for the "2015 stock redemption."  (Claim No. 14-1 at 2).  Caprock objected to Hall's claim and sought to classify Hall's claim as subordinated in its proposed Plan of Reorganization pursuant to 11 U.S.C. § 510(b).  (*See* ECF Nos. 49 and 62).  Hall filed a response to Caprock's objection.  (ECF No. 71).  The Court held a hearing on December 15, 2017, during which it instructed the parties to file cross motions for summary judgment on whether Hall's claim was subject to mandatory subordination under § 510(b).  On February 2, 2018, the Court held oral argument regarding the briefed issue, after which it took the matter under advisement.

## Jurisdiction

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

## Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Fed. R. Bankr. P. 7056 incorporates Rule 56 in adversary proceedings.

A party seeking summary judgment must demonstrate the absence of a genuine dispute of material fact by establishing the absence of evidence to support an essential element of the non-movant's case.  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009).  A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party.  *Gorman v. Verizon Wireless Texas, L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A court views the facts and evidence in the light most favorable to the non-moving party at all times.  *Ben-Levi v. Brown*, 136 S. Ct. 930 (2016).  Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence.  *Keen v. Miller Envtl. Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012).  "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence."  *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1715 (2016).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, showing that the materials cited do not

establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact. FED. R. CIV. P. 56(c)(1). The Court need consider only the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). The Court should not weigh the evidence. *Wheat v. Florida Par. Juvenile Justice Comm'n*, 811 F.3d 702, 713 (5th Cir. 2016). A credibility determination may not be part of the summary judgment analysis. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. FED. R. CIV. P. 56(c)(2). Moreover, the Court is not bound to search the record for the non-moving party's evidence of material issues. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).

"The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 326 (1986). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact. FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 322-24. The non-moving party must cite to specific evidence demonstrating a genuine dispute. FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-moving party must also "articulate the manner in which that evidence supports that party's claim." *Duffie v. United States*, 600 F.3d

362, 371 (5th Cir. 2010). Even if the movant meets the initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact. If the non-movant bears the burden of proof of an issue, the movant must show the absence of sufficient evidence to support an essential element of the non-movant's claim. *Celotex*, 477 U.S. at 325. Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case. *Id.* at 324. The motion should be granted only if the non-movant cannot produce evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

## Analysis

The material facts of this issue are not in dispute. Hall argues that he is a creditor who holds a general unsecured claim pursuant to Caprock's election to repurchase his shares of Common Stock. (ECF No. 87 at 1–2). Caprock characterizes Hall's claim as the sale of equity that is subject to mandatory subordination. (ECF No. 88 at 7).

Subordination affects a creditor's standing in the hierarchy of claims brought within a bankruptcy case. *In re SeaQuest Diving, L.P.*, 579 F.3d 411, 417 (5th Cir. 2009). If a creditor's claims are subordinated, they will only receive a distribution after those creditors with higher priority claims. *See id.* at 418. Section 510(b) of the Bankruptcy Code specifically addresses the issue of subordination regarding equity interests:

> A claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security.

11 U.S.C. § 510(b).  According to the statutory language, subordination is appropriate if a claim arises from the purchase or sale of a security in three situations: rescission, damages from the purchase or sale, or claims for reimbursement allowed under § 502.  *SeaQuest*, 579 F.3d at 418.

*Existence of a Claim and Security*

For mandatory subordination under § 510(b), a *claim* must arise from the purchase or sale of a *security*.  The Bankruptcy Code broadly defines a claim as a right to payment.  11 U.S.C. § 101(5).  Whether made as an equity holder or as a creditor, it is undisputed that Caprock agreed to pay Hall in five equal installments for his shares of Common Stock pursuant to the Shareholder Agreement.  (ECF No. 87 at 8).  Accordingly, Hall possesses a right to repayment from Caprock within the definition of a claim.

11 U.S.C. § 101(49) defines a security as a note, stock, or "right to subscribe to or purchase or sell, a security."  The underlying transaction that led to this dispute was Caprock's purported redemption of Hall's shares of Common Stock in Caprock.  (ECF No. 87 at 8).  Common Stock, as issued in the Shareholder Agreement, falls squarely within the Bankruptcy Code's enumerated definition of security.

*Section 510(b) – Arising From*

Caprock argues that, since Hall's claim originates from his equity interest in the company, it satisfies the Fifth Circuit's broad interpretation of "arising from" in § 510(b) even after it was redeemed.  (ECF No. 88 at 14–16).  Hall responds that, once his stock was redeemed, he became the holder of a debt obligation rather than an equity interest, entitling him to status as a general unsecured creditor.  (ECF No. 87 at 13).

The Fifth Circuit addressed a similar question in *In re SeaQuest Diving*.  A group of individuals formed a partnership to provide underwater oilfield services to the offshore industry.

*SeaQuest*, 579 F.3d at 414. However, disputes arose during the life of this partnership that led to litigation between the partners. *Id.* at 415. The parties reached a settlement that required paying one party, S&J, "an amount that is the equivalent that would have been called a priority return under the partnership agreement." *Id.* at 416. Yet, the remaining partners made no payment, forcing S&J to file a second suit in order to enforce the agreement. *Id.* This suit yielded a judgment in S&J's favor of $2,742,014.00. *Id.*

The remaining partners filed for bankruptcy before S&J could collect its judgment. *Id.* S&J filed a claim in SeaQuest's bankruptcy case, asserting the right to payment as an unsecured creditor. *Id.* at 419. An objection was raised to S&J's claim, arguing that S&J's claim should be subordinated pursuant to § 510(b). *Id.* S&J claimed that, as the holder of a state court judgment it was entitled to status as an unsecured creditor. *Id.* at 418. According to S&J, once it obtained its judgment, its rights as an unsecured creditor were fixed, regardless of the events and transactions that led to its state court judgment. *Id.*

The Fifth Circuit held that the phrase "arising from" in § 510(b) was ambiguous, and as such, examined legislative intent to decide whether its application was appropriate. *Id.* Although the legislative intent originally focused on rescission of claims in the context of securities fraud, the Fifth Circuit decided that it also applied claims brought about due to post-issuance conduct. *Id.* at 422. Specifically, the fact that there was a "nexus or causal relationship between the state court judgment and the rescission of the purchase of the [partnership] interests" satisfied the statutory requirement that it "arises from" the purchase of a security in § 510(b). *Id.* at 422.

The Fifth Circuit declined to decide whether to apply this same reasoning to a strict redemption scenario because S&J's judgment did not arise from its redemption of stock. *Id.* at

423.   Yet, in adopting its broad reading of "arising under," the Fifth Circuit explained that because a judgment falls within the broad definition of a claim in 11 U.S.C. § 101(5), a court may "look behind the judgment" to determine whether or not the claim arises from the rescission of a security.  *Id*. at 424.

In *SeaQuest*, the Fifth Circuit also examined the history and purpose of this provision to aid in its interpretation.  *See id*. at 418–19; *see also In re Med Diversified*, 461 F.3d 251, 256 (2d Cir. 2006); *In re Geneva Steel Co.*, 281 F.3d 1173, 1177 (10th Cir. 2002).  The goal of § 510(b) is to ensure the risk of loss is borne by equity holders who invest with the potential for significant financial gains rather than creditors who expect a fixed rate of return from a transaction.  *SeaQuest Diving*, 579 F.3d at 421.  Additionally, creditors often examine a debtor's "equity cushion" before extending credit, thus subordinating an equity holder's interest is necessary to protect creditors' reliance on this equity cushion and preserve it in case of insolvency.  *Id*.  In exchange for the upside of potential profits, part of the equity holders' bargain is the risk of losing their capital investments.  *In re Granite Partners, L.P*., 208 B.R. 332, 336 (Banrk. S.D.N.Y. 1997).

In this case, Caprock elected to repurchase Hall's shares of Common Stock according to the terms set forth in the Shareholder Agreement.  (ECF No. 87 at 8).  Hall urges that his rights were fixed once Caprock repurchased his shares, ending the Court's analysis.  (ECF No. 87 at 9).  However, *SeaQuest* demonstrates that the Court may look behind the transaction to determine whether or not Hall's stock repurchase "arises from" the sale of a security under § 510(b) and whether subordination would satisfy its legislative purpose.  *Id*. at 425.

The security at issue in this case constitutes common stock.  (ECF No. 87 at5).  It is settled in the Bankruptcy Code that common stock shareholders are not paid until higher priority

claims—secured creditors, unsecured creditors, and preferred stock shareholders—are satisfied. *See SeaQuest*, 579 F.3d at 417 (quoting *In re Am. Wagering, Inc.*, 493 F3d. 1067, 1071 (9th Cir. 2007)).  Accordingly, if Caprock had never elected its right to repurchase Hall's Common Stock, Hall could not argue that he was entitled to repayment as a general unsecured creditor.  Like the judgment in *SeaQuest*, looking behind the transaction demonstrates that subordination is appropriate because Hall's ultimate claim against the company is rooted in an equity interest. Characterizing his debt on par with other general unsecured creditors upsets the hierarchy of the bankruptcy priorities and thus allows him a greater recovery than he would normally be entitled to at the expense of other creditors.

Additionally, looking at § 510(b)'s legislative history in the context of securities fraud also supports the idea that subordination is appropriate.  Section 510(b) was enacted to "prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding."  *In re Telegroup, Inc.*, 281 F.3d 133, 142 (3d Cir. 2002).  Although securities fraud is not an issue in this case, Hall still seeks to elevate his claim to the status of a general unsecured creditor and recover what began with an equity investment.  Like the equity holder in *SeaQuest*, the legislative history of § 510(b) dictates that Hall cannot attempt to bypass the priority rules for bankruptcy claims by elevating what began as an equity interest to a general unsecured claim even in the absence of securities fraud.

*Hall's Arguments*

Hall points to a line of cases that purportedly hold that "claims based on the nonpayment of a debtor's debt obligation issued to repurchase its own stock are not subject to Section 510(b) subordination because such claims are only for the recovery of an unpaid debt."  (ECF No. 87 at

9).  Specifically, the bankruptcy court in *In re Mobile Tool Int'l, Inc.* recognized that, when an equity holder exchanged its security for a partial payment and a note, § 510(b) was inapplicable. 306 B.R. 778, 782 (Bankr. Del. 2004).  Once the equity was exchanged for notes, the court held the former equity holder's recovery was limited to a definite amount and lost the upside of unlimited recovery, making subordination inappropriate.  *Id*.

While this argument comports with Hall's view of the transaction, *Mobile Tool* is not controlling precedent on this Court.  Furthermore, the court's analysis in *Mobile Tool* was limited to only one aspect of § 510(b)'s purpose—whether the former equity holder could experience greater profits after exchanging it for a note.  *Id*.

This diverges from the Fifth Circuit's analysis of § 510(b)'s purpose which held "the investors *initially* bargained for the risk and return expectations of investors."  *In re SeaQuest Diving, L.P.*, 579 F.3d 411, 422 (5th Cir. 2009) (emphasis added).  The Fifth Circuit emphasized the initial election of the equity holder, pursuing greater return in exchange for lower priority, as a valid reason for subordinating their interest.  *Id*.  Here, Hall's interest began as Common Stock and rose and fell with the fate of Caprock.  (ECF No. 87 at 6).  It is this initial election cited in *SeaQuest*, rather than subsequent events that the Court uses to determine whether subordination is appropriate under § 510(b).  *Id*.

Hall separately echoes the argument in *Mobile Tools*, purporting that the lapse of two years between Caprock's repurchase of his Common Stock and its bankruptcy filing support his classification as a general unsecured creditor because his right to share in Caprock's profits was terminated.  (ECF No. 87 at 13).

However, Hall's distinction fails to recognize the fact that, up until Caprock made its election, his Common Stock was subject to profit sharing.  When purchase of the Common Stock

was discussed, Caprock performed a valuation of the company and paid Hall's stock in accordance.  (ECF No. 87 at 6).  Until the repurchase, Hall's Common Stock was tied to the fate of the company and could have yielded a far higher rate of return than his investment.  This separates him from other general unsecured creditors who only expected a fixed rate of return from the beginning of their transactions.  *SeaQuest Diving*, 579 F.3d at 421.

Additionally, the legislative history demonstrates that Congress did not intend to strictly limit application of § 510(b) to pre-issuance conduct.  Section 510(b) was enacted under the assumption that when making an equity investment, a shareholder assumes the risk that security fraud may occur regardless of whether it occurs pre or post-issuance.  *In re Telegroup, Inc.*, 281 F.3d 133, 141 (3d Cir. 2002); *In re Granite Partners, L.P.*, 208 B.R. 332, 340 (Banrk. S.D.N.Y. 1997).  The Fifth Circuit adopted this assumption in *SeaQuest* and declined to draw a distinction between pre and post-issuance conduct interpreting "arising from" in § 510(b).  579 F.3d at 421. Although Caprock's repurchase occurred two years prior to its bankruptcy, that fact is inadequate to confer general unsecured status onto Hall's claim.  Accordingly, the distinction Hall seeks to draw based on the timing of this transaction is unpersuasive.

The material facts of this case are not in dispute.  Caprock elected to repurchase Hall's shares of Common Stock.  Under the Fifth Circuit's broad view of "arising from" established in *SeaQuest*, Hall's proof of claim arises from Caprock's purchase of his Common Stock. Accordingly, Hall's claim against Caprock is subject to subordination under § 510(b).

## **<u>Conclusion</u>**

The Court will issue a Judgment consistent with this Memorandum Opinion.

SIGNED **<u>March 9, 2018.</u>**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE
